# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: ) | | |
| RESOURCE TECHNOLOGY CORP., ) | | |
| ) | | |
| Debtor, ) | Case No. 10 C 4703 | |
| ) | | |
| ------------------------------------------------------- ) | | |
| ) | | |
| CHIPLEASE, INC., ) | | |
| ) | | |
| Appellant, ) | | |
| ) | | |
| vs. ) | | |
| ) | | |
| STATE OF ILLINOIS, ) | | |
| ) | | |
| Appellee. ) | | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Chiplease, Inc. appeals from a bankruptcy court order granting the State of Illinois an administrative claim against the Chapter 7 bankruptcy estate of Resource Technology Corporation (RTC). Illinois opposes Chiplease's appeal and has cross-appealed seeking reversal of the bankruptcy court's ruling to the extent that it did not include reimbursement for tax credits given prior to June 6, 2006 as part of Illinois's allowed administrative claim. For the reasons set forth below, the Court affirms the bankruptcy court's order.

## Background

This appeal involves the application of an Illinois statute designed to encourage alternate energy production. Under 220 ILCS 5/8-403.1, entities that own certain types

of electricity-generating facilities can apply to the Illinois Commerce Commission (ICC) for designation of these facilities as qualified solid waste energy facilities (QSWEFs). Once a facility is classified as a QSWEF, the ICC requires the QSWEF's local electric utility to enter into a long-term power purchase agreement (PPA) obligating the utility to purchase electricity from the QSWEF at an elevated "retail rate" exceeding the rate established under federal law. *See generally* 220 ILCS 5/8-403.1(c)-(d). Illinois then compensates the utility for this added expense by giving the utility a tax credit for the difference in cost between the retail rate and the federal rate. 220 ILCS 5/8-403.1(d). When a triggering event later occurs, the QSWEF must reimburse Illinois for the tax credits received by the utility. *Id.* Under current law, a QSWEF's duty to reimburse is triggered by the earliest of three events: (1) the QSWEF's full repayment of the capital costs it incurred in developing the facility; (2) the QSWEF's cessation of operations; or (3) the termination of the underlying PPA. *Id.* However, prior to the June 6, 2006 effective date of a statute that amended section 8-403.1, the only trigger for this duty was a QSWEF's full repayment of its capital costs.

Illinois thus subsidizes the development of QSWEFs with what is effectively an indirect, interest-free loan. Section 8-403.1 enables a QSWEF to sell electricity to utilities at an elevated price. The extra revenue yielded by this transaction is retained by the QSWEF until a triggering event obligates the QSWEF to remit it to Illinois in the form of a tax credit reimbursement.

RTC was the owner and operator of a number of electricity-generating facilities. In 1997, two years before RTC's bankruptcy proceedings began, the ICC issued an order granting QSWEF status to ten energy-producing facilities owned by RTC.

Pursuant to the ICC's order, Commonwealth Edison (ComEd), the local electric utility, entered into three PPAs with RTC. These PPAs governed ComEd's purchases of electricity from RTC's QSWEFs at Lyons, Congress/Hillside, and Pontiac.

On November 15, 1999, creditors of RTC filed an involuntary Chapter 7 petition against RTC. Thereafter, RTC continued to produce electricity at the Lyons, Congress/Hillside, and Pontiac facilities as a debtor-in-possession. Pursuant to the PPAs, RTC received payment from ComEd at the retail rate. In January 2000, RTC consented to an order converting its case from a Chapter 7 proceeding to a Chapter 11 proceeding, effective February 11, 2000. RTC continued to operate the facilities as a debtor-in-possession until the bankruptcy court appointed a Chapter 11 trustee on August 26, 2003. The trustee then continued operations until September 21, 2005, when the bankruptcy court entered an order converting the case to a Chapter 7 proceeding. The court appointed a Chapter 7 trustee and authorized the new trustee to continue operating RTC's QSWEFs.

In October 2005, the trustee filed a lawsuit against Chiplease, Scattered Corporation, Leon Greenblatt and other entities for breach of fiduciary duty and other causes of action. On February 17, 2006, the trustee filed a motion for authority to settle the lawsuit. The settlement agreement proposed, among other things, the assignment of certain leases and executory contracts to Chiplease and Scattered and/or their respective designees. The bankruptcy court granted the trustee's motion and approved the agreement on March 16, 2006. On March 28, 2006, the trustee transferred these assets to Chiplease, Scattered, and/or their designees pursuant to the settlement agreement. The trustee also ceased the RTC estate's operations at the Lyons,

3

Congress/Hillside, and Pontiac QSWEFs.  However, RTC continued producing electricity at the Pontiac location under the operation of other individuals until July 2006.  Between March 28, 2006 and July 2006, RTC received payments at the retail rate from ComEd for electricity produced at the Pontiac location.  These payments were sent to RTC's bankruptcy "lockbox" in accordance with a court-approved debtor-in-possession financing agreement.

On January 4, 2007, Illinois filed its first motion for allowance and payment of a Chapter 7 administrative expense claim.  On June 24, 2009, Illinois filed an amended motion.  Chiplease objected to both motions.  The amended motion sought a total of $1,518,048.72 for reimbursement of tax credits taken by ComEd in connection with its purchase of electricity from QSWEFs at Pontiac, Congress/Hillside, and Lyons pursuant to the PPAs, as well as $14,358.82 for a separate tax-related claim.  Chiplease and Illinois entered into a stipulation regarding the facts, and the case was submitted for trial before the bankruptcy court.

On April 27, 2010, the court issued its first ruling.  Because Chiplease did not oppose Illinois's separate tax-related claim, the court allowed it without discussion.  The court then considered Illinois's tax credit reimbursement claim and rejected all of Chiplease's arguments opposing the claim's allowance.  However, the court independently raised the issue of whether the 2006 amendments to section 8-403.1 might limit the amount of Illinois's claim.  Recognizing that the 2006 amendments created new triggers for a QSWEF's duty to reimburse, the court noted that no facts in the record suggested that RTC satisfied the trigger that applied prior to the enactment of the 2006 amendments.  The court reasoned that if the 2006 amendments apply only

4

prospectively, RTC would have no duty to reimburse Illinois for tax credits taken by ComEd prior to June 6, 2006. By contrast, if the amendments apply retroactively as well as prospectively, RTC would be required to reimburse Illinois for tax credits taken both before and after the amendments' effective date. To consider this issue, the court delayed ruling on whether the tax credit reimbursement claim should include tax credits taken prior to June 6, 2006. The parties later submitted briefing on the potential retroactivity of the 2006 amendments.

On June 8, 2010, the court issued its second ruling on the administrative claim. The court held that the 2006 amendments were not intended to apply retroactively, and therefore Illinois's administrative claim was limited to reimbursement for tax credits taken by ComEd between June 6, 2006 and July 2006. The court concluded that the 2006 amendments did not explicitly state that they were intended to apply to tax credits received by a utility prior to their effective date. As such, Illinois's default statutory rule against retroactivity controlled the court's construction of the 2006 amendments. *See* 5 ILCS 70/4. The court also rejected Chiplease's argument that the 2006 amendments should not apply prospectively, concluding that prospective changes to a statute do not implicate a party's constitutional rights. The court entered an order allowing as Chapter 7 administrative expenses Illinois's claims for reimbursement of tax credits taken after June 6, 2006, totaling $175,710.58.

Chiplease and Illinois both appealed. Chiplease argues that the bankruptcy court should not have allowed Illinois's administrative expense claim. Illinois argues on cross-appeal that the bankruptcy court should not have limited its claim to tax credits taken after June 6, 2006.

**Discussion**

The Court has jurisdiction under 28 U.S.C. § 158(a). Because the facts were stipulated during the bankruptcy court proceedings, the parties challenge only the bankruptcy court's legal conclusions, which the Court considers *de novo*. *Ojeda v. Goldberg*, 599 F.3d 712, 716 (7th Cir. 2010).

1. **Allowance of the tax credit reimbursement claim**

The Court first considers whether the bankruptcy court properly allowed Illinois's Chapter 7 administrative claim for reimbursement of tax credits taken by ComEd. Administrative expenses authorized under 11 U.S.C. § 503 receive first priority in the distribution of estate assets. 11 U.S.C. § 507(a)(1). Under section 503, "administrative expenses" include "the actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(a)(1)(A). A court will afford a debt administrative priority "if the debt both (1) arises from a transaction with the debtor-in-possession and (2) is beneficial to the debtor-in-possession in the operation of the business." *In re Jartran*, 732 F.2d 584, 587 (7th Cir. 1984) (internal quotation marks omitted).

Illinois's administrative claim satisfies both elements of the test articulated in *Jartran*. First, the claim arises from a transaction with RTC. Illinois's statutory right to receive reimbursement for the tax credits is a consequence of the ICC's decision to grant QSWEF status to RTC: because the ICC granted QSWEF status to RTC's facilities, RTC was able to enter into PPAs with ComEd and sell electricity at the retail rate. The retail rate sales entitled ComEd to tax credits, which in turn gave Illinois a right to reimbursement from RTC upon the occurrence of a triggering event specified in

6

section 8-403.1(d)—here, RTC's cessation of QSWEF operations. And although RTC received QSWEF status and entered into the PPAs with ComEd prior to entering bankruptcy, "the first *Jartran* element turns on whether the right to payment arises pre-petition or post-petition, not the time at which the contract is executed." *In re Nat'l Steel Corp.*, 316 B.R. 287, 301 (Bankr. N.D. Ill. 2004). Illinois's right to payment arose when QSWEF operations ceased, long after RTC entered bankruptcy. To the extent that Illinois's administrative claim can be analogized to a loan repayment, as Chiplease argues, such repayments can qualify as administrative expenses under the Bankruptcy Code. *See* 11 U.S.C. § 364(a) ("If the trustee is authorized to operate the business of the debtor . . . , unless the court orders otherwise, the trustee may obtain unsecured credit and incur unsecured debt in the ordinary course of business allowable under section 503(b)(1) of this title as an administrative expense.").

The administrative claim also satisfies the second element of the *Jartran* test. The tax credits ComEd received benefitted RTC because they enabled it to charge ComEd the higher retail rate for electricity generated at the QSWEFs. If RTC's facilities had lost or failed to obtained QSWEF status (thereby avoiding the eventual duty to reimburse Illinois for ComEd's tax credits), RTC would have been forced to sell electricity to utilities at the lower federal rate. The tax credits thus brought value to RTC's estate by enabling RTC to obtain an elevated price for its electricity.

Chiplease contends that Illinois's administrative claim is barred by the doctrine of claim preclusion. According to Chiplease, Illinois's opportunity to assert the administrative claim passed when the bankruptcy court issued an order assigning the Lyons PPA to Chiplease and resolving all contractual cure costs under that PPA.

7

However, as the bankruptcy court correctly determined, Illinois's administrative claim is statutory in nature, not contractual: RTC's obligation to reimburse Illinois arose by operation of section 8-403.1(d). In other words, Illinois's administrative claim is distinct from any potential contractual cure costs arising from the PPAs. Moreover, as the court noted, Illinois was not a party to PPAs, which were contracts formed between RTC and ComEd. Therefore, there is neither "an identity of the parties" nor an "identity of the cause of action" between the assignment order proceedings and the present appeal. *Alvear-Velez v. Mukasey*, 540 F.3d 672, 677 (7th Cir. 2008) (quoting *Prochotsky v. Baker & McKenzie*, 966 F.2d 333, 334 (7th Cir. 1992)). Claim preclusion does not apply.

Chiplease also argues that Illinois's administrative claim cannot be asserted against RTC's estate because only the particular "facility" is responsible for paying tax credit reimbursements under section 8-403.1(d). The bankruptcy court properly rejected this argument. RTC was the sole owner of the QSWEFs in this case and was a party to the PPAs with ComEd. It received all electricity payments made by ComEd pursuant to the PPAs. In short, RTC was the only legal entity responsible for maintaining and operating the QSWEFs. Just as RTC properly received retail rate payments from ComEd in accordance with section 8-403.1(c), RTC is responsible for reimbursing Illinois for tax credits as they become due pursuant to section 8-403.1(d).

Finally, Chiplease argues that Illinois's administrative claim is unripe because, under section 8-403.1(d) as it existed prior to the 2006 amendments, RTC currently has no obligation to reimburse. This argument fails with respect to any tax credits taken after June 6, 2006, the effective date of the 2006 amendments. Tax credits taken after

8

that date are subject to the additional two triggering events created by the amendments: cessation of QSWEF operations and termination of the underlying PPA. The Pontiac QSWEF produced power after June 6, 2006 and ceased operations in July 2006. And as the bankruptcy court correctly held, Chiplease has no constitutionally protected interest in the continuation of former law. *Cf. New Heights Recovery and Power, LLC v. Bower*, 347 Ill. App. 3d 89, 95-96, 806 N.E.2d 1156, 1162 (2004) ("We are unaware of authority that would support a finding that prospective application of amendatory acts implicates constitutionally protected rights."). Therefore, RTC has a duty to reimburse Illinois for tax credits taken by ComEd in connection with its electricity purchases from RTC after June 6, 2006.

In summary, the bankruptcy court correctly determined that Illinois's claim for reimbursement of tax credits taken by ComEd qualifies as an administrative expense under section 503(b) of the Bankruptcy Code. Any tax credits taken by ComEd after June 6, 2006 are subject to reimbursement under section 8-403.1(d) given that electricity-generating operations at all three QSWEFs ceased by July 2006.

## 2. Retroactivity of the 2006 amendments

Illinois argues on cross-appeal that, although the bankruptcy court correctly held that its reimbursement claim qualifies as an administrative expense, the court wrongly concluded that tax credits taken by ComEd prior to June 6, 2006 are not currently subject to reimbursement. Illinois contends that the 2006 amendments clearly evince the legislature's intent that the changes apply retroactively, and thus tax credits taken by ComEd prior to the amendments' enactment are allowable as part of Illinois's Chapter 7 administrative claim.

9

To determine whether an amendment to a state statute applies retroactively, Illinois courts employ the framework articulated in *Landgraf v. USI Film Products*, 511 U.S. 244 (1994). *See Caveny v. Bower*, 207 Ill. 2d 82, 91, 797 N.E.2d 596, 601 (2003). Under this analysis, courts first consider "whether the legislature has clearly indicated the temporal reach of an amended statute." *Id*. In Illinois, "the legislature has clearly indicated the temporal reach of *every* amended statute" because it has adopted a statute, 5 ILCS 70/4, that generally bars the retroactive application of substantive statutory amendments. *Id.* at 92, 797 N.E.2d at 601 (emphasis in original). Accordingly, Illinois courts begin and end at step one of the *Landgraf* test. If the court determines that an amended statute clearly indicates its temporal reach, then "absent a constitutional prohibition, that expression of legislative intent must be given effect." *Id.* at 94, 797 N.E.2d at 603. By contrast, "[i]f the amendatory act does *not* contain a clear indication of legislative intent, then it is to be assumed that the amendatory act was framed in view of the provisions of [5 ILCS 70/4]." *Id*.

Illinois argues that, contrary to the bankruptcy court's findings, two provisions of the statute reflect the legislature's intent that the 2006 amendments apply retroactively. First, Illinois notes that when a triggering event occurs, the statute requires a QSWEF to reimburse Illinois "for the actual reduction in [tax] payments" caused by subsection (d). 220 ILCS 5/8-403.1(d). Illinois argues that this provision unambiguously reveals an intent that *all* tax credits be reimbursed, not just those taken after the effective date of the amendments. Second, Illinois points to a different subsection that provides, "[a]s a guide to the intent, interpretation, and application of this amendatory Act," that Illinois

will "honor each [QSWEF] in existence on the [effective date of the 2006 amendments] if the [QSWEF] continues to meet the requirements of this Section for the duration of its respective contract term." 220 ILCS 5/8-403.1(n).

The bankruptcy court correctly concluded that section 8-403.1, as amended, contains no clear indication of its intended temporal reach. First, subsection (d) contains no such statement. Illinois correctly notes that this subsection draws no obvious distinction between reimbursements for pre-amendment and post-amendment tax credits. From this fact, Illinois infers that the legislature intended the amendments to apply equally to pre- and post-amendment tax credits. But this inference cannot stand in light of the default rule against retroactivity imposed by 5 ILCS 70/4. As the bankruptcy court correctly noted, the legislature could have just as easily been relying on section 4 to ensure that section 8-403.1 would apply only to an "actual reduction" in payments caused by tax credits taken after the amendments' enactment. Had the legislature intended otherwise, it could have said so in plain language. Subsection (d) is thus ambiguous as to its temporal reach.

Subsection (n) likewise provides no support for Illinois's argument. As Illinois notes, subsection (n) effectively restarts the QSWEF program while "grandfathering in" existing QSWEFs that continue to satisfy the requirements of section 8-403.1. But the subsection says nothing about whether changes to those requirements resulting from the 2006 amendments are to be applied retroactively or merely prospectively. As with subsection (d) above, the legislature could have been relying on section 4 to establish that new requirements would only apply going forward. As such, subsection (n) provides no support for Illinois's argument in favor of retroactivity.

Section 8-403.1, as amended, contains no language clearly demonstrating that the legislature intended it to apply retroactively. In the absence of such language, the default rule against retroactivity from 5 ILCS 70/4 applies. Accordingly, the bankruptcy court correctly held that RTC does not yet have a duty to reimburse Illinois for any tax credits taken by ComEd prior to June 6, 2006.

## Conclusion

For the foregoing reasons, the Court directs the Clerk to enter judgment affirming the decision of the bankruptcy court.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: February 10, 2011